First case on our call this morning is Agenda No. 1. People of the State of Illinois, Applee v. Daniel B. Ramsey. Mr. Hoffman, you may proceed. Thank you, Mr. Chairman. Good morning, Your Honors. My name is Charles Hoffman. I represent the appellant Daniel Ramsey. On July 8, 1996, at the age of 18 years and 3 months, Daniel Ramsey raped and killed his best friend, 16-year-old Laura Marson. Later that day, he shot and wounded his 17-year-old girlfriend, Rachel Sloop, who had just broken up with him. And he also shot and wounded Rachel's 12-year-old sister, Lana. He then shot and wounded two children of a friend, young kids who looked up to Dan as their big brother. A jury rejected the defense of insanity, convicted Dan Ramsey of murder, and sentenced him to death. In 2000, this court reversed his conviction because the insanity statute under which he was tried was unconstitutional. This court remanded it for a new trial. However, on remand, there was no new trial. Mr. Ramsey pled guilty to murder and other felonies, and a jury again sentenced him to death. This is the second direct appeal in this capital case. We've raised a number of issues in our brief. If time permits, I'd like to address three of those issues this morning. The first is that the trial court failed to require that Dan Ramsey be represented by a certified capital litigation trial bylawyer at his 2007 death penalty proceedings. The second issue is that the trial court aired an excluding testimony by the defense mental health expert that the mental disorders from which Dan Ramsey suffered could also be characterized as mental disturbances. And finally, that the prosecutor improperly argued to the jurors in closing that Dan Ramsey's 11-year history of good conduct while incarcerated in this case was irrelevant to their sentencing decision. As I said, the first issue I'd like to argue is that the trial court aired in refusing to require that Dan Ramsey be represented by certified death penalty lawyers. This court, probably more than any other governmental institution, is certainly familiar with the troubled history of the death penalty in Illinois. More than a decade ago, this court appointed a special committee on capital cases, and this court adopted a number of reforms that that committee recommended. I think it's fair to say that the centerpiece of those reforms was the creation of the capital litigation trial bar in new Rule 714 and the requirement that only certified members of that bar can appear as counsel in capital cases in amended Rule 701. Was the defendant in this case in court ever apprised of the certification issue? Justice Freeman, there was a lot of talk during the years that this case was pending pretrial about the capital litigation trial bar. He was never admonished about what that meant. There was just a lot of discussion about whether the lawyers needed to be certified. Of record in court. Of record in court. At one point, Mr. Ramsey was asked, do you have anything to say about your lawyers? And he simply replied, I don't have anything to say about that. I don't think there's any way he understood what the capital litigation trial bar was. This was a discussion among the prosecutors, the defense lawyers, and the judge. But he was never admonished. You have a right to a capital litigation trial bar. They have to undergo training. And I think the reason he wasn't admonished, Justice Freeman, is nobody in the trial court thought the rule applied, neither the prosecutors nor the defense lawyers nor the trial judge. What was the basis for the refusal of the attorneys? Well, the basis of the refusal of the attorneys to be certified, they said on the record they didn't need to. That's all they said. That they didn't think the rule applied because, although Dan Ramsey was tried five years after the effective date of the rule, he was charged in 1996, five years before the effective date of the rule. And the effect of that, at least by the plain reading of the statute, was to exclude Mr. Ramsey's case from the certification process. That's true. There's a notation after the rule that says it applies to cases that are charged by indictment or information after its effective date. So the plain language does exclude Dan Ramsey's case. But we argue that this court needs to look past the plain language of that notation following Rule 701. And that's because if you apply the plain language, it leads to an absurd and unjust result. What is the absurd and unjust result? I mean, isn't it true that the language in the rule is consistent in consideration of the fact that changing defense attorneys after proceedings might be delaying or disruptive? I don't think that was a consideration. I think the consideration in delaying the effective date was to get the capital litigation trial bar up and running, get the lawyers trained. That's what the special committee wrote. Justice Burke, there were nine cases in which defendants' charging instruments were filed before the effective date. The only person who didn't get a capital litigation trial bar lawyer was Dan Ramsey. The other eight did, even though their charging instruments were for the effective date. And there was no delay or disruption in their cases. And I think when you're dealing with something as important as whether a person has a qualified lawyer in a death case, so be it. There may be a little delay or disruption. Was it sufficient that one of the trial judges found that both of the defense counsels were qualified? Well, apparently it was the judge's opinion that they had enough experience to do capital cases. But that didn't mean that they were qualified to be members of the capital litigation trial bar. They may have had the litigation experience, but they had none of the required training that this court requires. And there was no showing that they had familiarity with forensics, mental health experts, none of the other requirements. Mr. Hoffman, should the court be concerned with the fact that the state actually thought that membership would alleviate any potential appellate issue here? I mean, the state wanted them to get certified, didn't they? The state suggested over and over that they get certified. Before you answer the question, let me just ask you, should we be concerned then that were we to be somewhat cynical, it's a built-in appellate issue, isn't it, for the defendants' attorneys to say, you know, we don't need to get certified? I don't think it's a built-in appellate issue, and here's the reason, Justice Thomas. The judge could have said to the lawyers, get certified or get off the case. These lawyers didn't have control over whether or not they would become certified if the judge told them to get certified. A very simple solution to any tactic that the defense lawyers were using. Now, I think the reason... Would you talk a little bit more in response to Justice Burke's question about where's the fundamental injustice here for this defendant? The injustice is that he did not get the lawyers to which he was entitled. When this court initially promulgated Rule 701, you defined who can be counsel in courts in Illinois. When you amended Rule 701, you defined who can be counsel in capital cases in Illinois. Does the defendant set forth or argue or point to things that he believes, how these counsels were deficient? Is that an issue or not? It may or it may not be. If we need to make some kind of prejudice showing, which I don't think we do, we do allege several instances of ineffective assistance of counsel in this case, showing that these lawyers were not familiar or didn't do what was required under the prevailing capital law at that time. We've argued that they were ineffective for not objecting to improper arguments at sentencing. We've argued that they were ineffective for not having their mental health expert provide the correct opinion at a pretrial deposition. So we do allege prejudice. But I don't think we need to show prejudice, Justice Garmon, and here's why. This court has granted relief in cases in which its other prophylactic rules have been violated. This is a prophylactic rule, just like Rule 401 or Rule 402. It's designed to ensure that the underlying constitutional protections aren't violated. And we've cited a case which I think is analogous, People v. Campbell, which is a Rule 401 case in which the trial judge did not give the defendant his Rule 401 admonishments. And, of course, that rule is designed to ensure that a counsel waiver is knowing and intelligent. Now, there was no allegation in Campbell that the counsel waiver was unknowing or unintelligent, just that the judge didn't apply Rule 401, and this court reversed. Now, the defendant in that case didn't even have a constitutional right to counsel because he wasn't sentenced to imprisonment, but he did have a statutory right to counsel, just like Mr. Ramsey had a right to counsel defined by this court's rules. And just as in Campbell, I think this court should say our rules are rules, they're not suggestions, and if this rule applies in Dan Ramsey's case, he was deprived of the counsel to which he was entitled. The only court to address this issue is the appellate court last year in Alvarez-Garcia. Now, admittedly, that was dicta because they ultimately found that the facts in that case showed that the lawyers were, in fact, certified at the relevant times. But the appellate court said if a licensed attorney who represented a defendant in the capital case was not certified as a member of the litigation trial bar, that would constitute a per se denial of the defendant's right to counsel. I also think it's important, Justice Garmon, to keep in mind these reforms were not enacted simply for the benefit of criminal defendants. They were enacted for the benefit of society as a whole. It's not just defense lawyers that have to be certified. It's also prosecutors. And I think it's important that this court let the bench and the bar and the public know that this court is serious about enforcing its death penalty laws. We don't want to go down that slippery slope again of back to the days when there were serious questions about our death penalty procedures.  And I think it's a bit intimidating to stand here before this court and tell it what its intent was in passing this rule, especially with the chairman of the special committee sitting right in front of me, Justice Fitzgerald. But I just don't think this court intended, when it enacted Rule 701 in 2001 and made it effective in 2002, that a defendant facing death in 2007 would not be entitled to a certified lawyer. By the time of Dan Ramsey's proceeding, there were over 700 certified lawyers in Illinois. Were these attorneys appointed or were they private counsel? They were appointed. Is your position, counsel, that there can't be harmless error here? Yes. Because this issue was not raised in the post trial, was it? No, of course it wasn't because the lawyers didn't think they had to be certified. So, of course, they weren't going to raise this issue, and I don't think anyone would expect Mr. Ramsey to know enough to raise this issue. So we do argue it can't be harmless. And the reason we argue that the court needs to go beyond the plain language of the rule, which its case law allows it to do, there are numerous cases that say if the plain language of the rule may lead to an absurd or unjust result, you can look to the reasons for the rule, the evils to be remedied, and the purpose to be achieved. And here's the real problem. The state urges that this court enforce the plain language of the rule. But if you do that, if you say the rule applies according to its plain language, there are eight other men and women, excuse me, men at this point on Illinois' death row, whose charging instruments were filed before the effective date of the rule. If this rule doesn't apply... How many of those cases have been litigated? Several have. Two have been... Not to this level. Up to this level, yes. Several have been litigated up to this level. Was the issue whether or not... No, there was no issue. And here's why. They all got certified trial lawyers. Every single one of them. You're picking the fact up that they have certified trial lawyers because that's what the records demonstrate in each case. Yes. Not because it was an issue in the case. It was not an issue in the case. Because they got certified lawyers, so it was no issue. Here's the problem. If you don't apply the rule to any of these cases, if any of those eight defendants get relief, either in this court or in post-conviction, or even years down the road in federal habeas, and they come back for retrial or resentencing two years, five years, ten years from now, would it not be an absurd and unjust result if they were denied capital litigation trial bars simply because their charging instruments were filed originally before the effective date of the rule? That would make no sense whatsoever. And if it doesn't make sense for those defendants, it certainly doesn't make sense for Dan Ramsey. He was entitled to a capital litigation trial bar. But outside of those eight, there are many death penalty defendants that have been tried and that did not have capital litigation trial bar attorneys. You'd admit that. None of them are on death row at this time. Not at this time. Not at this time. It came prior to those eight. Yes. And I think the problems in their cases is what led this court to enact its reforms. I understand, but those cases were not resurrected to indicate since they didn't have capital litigation trial bar attorneys that they necessarily would be entitled to a new trial at this stage. No, and under Hickey, they wouldn't. Because in Hickey, this court held that the reforms are not in and of themselves of constitutional dimension, and so they don't provide in and of themselves the basis for post-conviction relief. So why wouldn't in this case, and you want us to go beyond the plain reading, why wouldn't in this case just ineffective assistance of counsel rules apply as well as to whether or not the trial court made some type of ruling that they were competent to try this particular case, right? Well, I think the problem with that would be it's inconsistent with this court's well-established law in how it deals with other prophylactic rules that are designed to protect constitutional rights. Why grant relief if there's an invalid counsel waiver under 401 unless the defendant can show that his counsel waiver was actually unknowing and unintelligent? Why grant relief in a Rule 402 guilty plea case if the defendant didn't get correct admonishments unless the defendant could also show that his guilty plea was actually involuntary or unintelligent? That's just not how this court does business, Justice Thomas, and I think why pass the rule in the first place if a defendant is required to show ineffective assistance under Strickland? Again, I think there's a reason the rule was passed to require that counsel, not just that counsel may end up doing a good job, but that this court certifies to the public and to the bar that this lawyer is qualified. What if tomorrow a trial judge appoints lawyers in a capital case who aren't certified? Let's say those lawyers do a fine job. Are there no consequences? Can the trial bench simply ignore this court's rules? Again, I think this court's rules are rules and not suggestions, and if the rule applied here, Dan Ramsey is entitled to a new trial or a new sentencing hearing. Now, if this court doesn't feel his guilty plea was affected by the lack of a certified lawyer? You argue that this could void either or both conviction and the sentence. Is that correct? Yes. What is the basis of the sentence? The basis of voiding the sentence is this court may feel that since he pled guilty, it didn't matter whether or not he had a lawyer who was certified to do the trial. As for the sentence, I argue that this court can vacate the sentence under fundamental justice. Let's say even if this court feels that the rule may not be applicable. Section 5-9i says this court can vacate a death sentence if it believes that it is fundamentally unjust, even where the defendant was otherwise competently sentenced. We've also pointed out, Chief Justice Fitzgerald, that Dan Ramsey is the only person who was and who ever will be sent to death row without certified lawyers, and we think that's arbitrary and it's irrational, and even if this court thinks the rule doesn't apply, we think it's fundamentally unjust. I've said single him out as the only person to be sentenced to death without the right to certified lawyers. If there are no more questions on this issue, I'll move on to the second issue, which is that the judge erred in excluding the testimony of defense psychiatrist Henry Conroe that the mental disorders from which Dan Ramsey suffered could also be considered disturbances. One of the major themes of mitigation in this case was that the death penalty wasn't appropriate because Dan Ramsey suffered from a number of chronic mental disorders. In mitigation, the defense psychiatrist Henry Conroe testified that these disorders impaired his ability to make judgments and manage his feelings, that his breakup with his girlfriend Rachel Sloop just days before the murders intensified his feelings of rejection and abandonment, and in Dr. Conroe's opinion at the time of the crimes, Dan Ramsey was under extreme duress from these disorders. Now, before Dr. Conroe left the stand, defense counsel asked him, can these disorders also be characterized as disturbances, and Dr. Conroe replied yes. Now, why did defense counsel ask this question? To make clear to the jurors that Dr. Conroe's testimony was relevant to and supportive of the statutory mitigating factor on which they were going to be instructed, that the defendant was under the influence of an extreme mental or emotional disturbance. Unfortunately, the prosecutor objected. The trial judge not only sustained the objection, but instructed the jurors to disregard counsel's question and Dr. Conroe's answer. That ruling left the jurors with the exact opposite impression of what defense counsel intended. That is, based on the judge's ruling and admonishment, the jurors must have been left with the impression that disorders can't be considered disturbances and that Dr. Conroe's testimony was not relevant or supportive of the statutory mitigating factor. That was an error for a number of reasons. First, Dr. Conroe's testimony that disorders can be characterized as disturbances wasn't an opinion at all, let alone a previously undisclosed opinion, and that was the basis of the judge's ruling, that Dr. Conroe's testimony was a previously undisclosed opinion because he hadn't put in his report or testified at his deposition that Dan Ramsey was under the influence of an extreme mental or emotional disturbance at the time of the crime. But I think it's important to bear in mind exactly what it was the prosecutor objected to and what he didn't object to. He didn't object to Conroe's testimony that Dan Ramsey suffered from a number of disorders, that he had difficulty in social relationships, that his life was marked by instability, that he was extremely sensitive to feelings of abandonment and rejection, that he was thrown into deep despair when he was rejected by Rachel days before the murders, and that at the time of the crimes he was under extreme duress from these disorders. None of that was objected to by the prosecution. The only objection the prosecutor made was to Conroe's testimony that disorders can be characterized as disturbances. Well, that wasn't dependent on Dr. Conroe's opinion. That was based on the nature of the disorders themselves as described in the Diagnostic and Statistical Manual of Mental Disorders, which when describing these very disorders uses the word disturbance interchangeably. It's exactly like it's not my legal opinion that a statute can also be characterized as a law. That's just a fact. Was defense counsel allowed to argue that to the jury? Well, it's interesting that you ask that question, Justice Garmon, because when I was preparing for this argument I was going to argue to the court that in considering whether the impression left by the judge's ruling, you have to put yourselves in the place of a lay juror, what impression the judge's ruling would have had on a lay juror. But then I realized defense counsel must have been left with the same impression, that the judge's ruling meant that Dr. Conroe's testimony couldn't be considered as supportive of the statutory mitigating factor. Because inexplicably, otherwise, even though they called Dr. Conroe, I think for the obvious purpose of establishing extreme mental or emotional disturbance, defense counsel never argued to the jurors at sentencing that Dan Ramsey was under the influence of an extreme mental or emotional disturbance. Now, they did argue that he was mentally ill. They repeatedly told the jurors that he was mentally ill. But I think that only exacerbated the problem, because if the jurors don't consider Dr. Conroe's testimony as falling under the statutory mitigating factor, there are a lot of problems that flow from that. First of all, jurors, I think, even though the law doesn't make the distinction, I think jurors do make the distinction between statutory mitigation and non-statutory mitigation. Obviously, I think they give more weight and more consideration, if they're instructed by the judge that certain evidence is actually mitigating, that it doesn't fall into the catch-all provision. A bigger problem, though, is that non-statutory mitigating evidence can also be considered aggravating. And this court made that distinction in People v. Kuntu. Statutory mitigation is inherently mitigating. It's a one-edged sword. Non-statutory mitigation is a two-edged sword and can be argued as aggravating, and can be considered by jurors as aggravating, especially non-statutory mitigation such as mental illness. Jurors may think that a defendant's mental illness is actually aggravating, if it falls into the catch-all provision. And that's what the jurors were left with here. For all we know, the jurors considered Dan Ramsey's mental illness as aggravating. Now, had the judge allowed Dr. Conroe to testify that disorders are disturbances and had defense counsel argue to the jurors that Dan Ramsey's mental disorders and his behavior fell into the statutory mitigating factor, that would have been inherently mitigating and considered by the jurors as mitigating. And I think it's important to realize that in this case, even if you consider it an opinion, it was not an undisclosed opinion. It's true that Dr. Conroe, in his report and his deposition, didn't use the words extreme mental or emotional disturbance. But his report and his deposition are loaded, loaded with opinions, which exactly describe what this court described in People v. Phillips when it defined extreme mental or emotional disturbance. This court said in Phillips, a defendant acts under extreme mental or emotional disturbance when an event somewhat contemporaneous with the murder could have inflamed the defendant's emotional stance to such a fragile point as to leave him with little to no emotional control. That's what the factor means. Here's what Dr. Conroe wrote in his report. The intense feelings of abandonment following the breakup of the relationship with Ms. Lu precipitated depression and suicidal ideation. In an attempt to alleviate his anger and depression, he sought solace with Ms. Marston as he lacked his own internal resources and structure to calm himself. It was difficult for him to maintain emotional balance and inhibit the feelings that were overwhelming him. He could not control the intense feelings that overwhelmed him. That's his report. That sounds exactly like Phillips to me. The same with his deposition testimony. He testified Dan Ramsey's feelings were so intense, they overcame his abilities to maintain control. On the day of the murders, there was a confluence of events that led to his feelings overwhelming him. This was extreme mental or emotional disturbance. The only thing missing was the label. And that's why counsel asked if disturbances can also be considered disorders. I don't think it was an opinion. I don't think it was an undisclosed opinion, even if it was. And finally, I think the sanction that the judge imposed was far too harsh. Even if this had been a discovery violation, even if Dr. Conroe should have testified in his deposition that disorders can be disturbances, the extreme exclusion of defense evidence in a criminal case should only be applied in the most extreme situations. This wasn't an extreme situation. The prosecutors never argued they were surprised or that they were unprepared. I think what the judge should have done is allowed the state to impeach Dr. Conroe by omission. So let the prosecutors, let the jury know that Dr. Conroe had not testified at his deposition that disorders were disturbances and let the jury figure out what that meant, whether that meant he was impeached or not. But unfortunately, the record shows here the trial judge never even considered a lesser sanction. And we think that was an abuse of the trial judge's discretion and for that reason we ask this court to vacate Dan Ramsey's death sentence and remand this case for a new sentencing hearing. I don't believe I have time to argue my third issue, but I will just say that the evidence shows that Dan Ramsey had three minor disciplinary tickets for nonviolent infractions, making a phone call when he shouldn't have. Other than that, he was a model prisoner for 11 years. That's mitigating evidence. It was wrong for the prosecutor to tell the jurors that that evidence was irrelevant to their sentencing decision. That skewed the weighing process here and we argue that that's another reason that Dan Ramsey's death sentence should be vacated and this case remanded for resentencing. Does the court have any questions? Thank you, counsel. Thank you. May it please the court. Counsel. My name is Leah Bendix from the Illinois Attorney General's Office on behalf of the people of the state of Illinois. Now, while this case does present six issues because opposing counsel has focused on two issues, I will begin by responding to those arguments first, but of course I would be happy to answer questions on any of the issues at any time. So turning then first to the issue of the capital litigation trial bar certification of defense counsel, whether this court applies the plain language of the effective date language or even if this court were to extend it to the situations of retrials, under the facts of this case, the rule simply does not apply and this is not an absurd result. In the alternative, any error was not reversible error because it was invited, forfeited, and harmless. Beginning with the plain language, defendant does agree that because of the facts of this case, the rule does not apply given the fact that the charging instrument was filed more than five years prior to the effective date. Then counsel, how do you expect the consequences of the other eight people who had trial dates or indictments were before the effective date as well? Well, perhaps they thought in the exercise of caution that it's a good idea to go ahead and get certified even if they were not required to do so. I'm not specifically aware under those cases why that occurred, but that certainly is a plausible explanation. And indeed, as was pointed out in questions to opposing counsel, the state urged defense counsel on multiple occasions that it really would be prudent to go ahead and get certified to avoid a potential appellate issue in the future. Now, while defendant likes to point out these extra eight cases, looking and focusing on this case, it is still true that defense counsel not only admitted and acknowledged and agreed with the court that the plain language of the rule did not apply, but defense counsel's response when encouraged to be certified was to say if the state is concerned that they should simply stop seeking the death penalty. Now, I think actually that that is very compelling evidence that defense counsel was either aware that this could create an issue on appeal or was trying to at least use the issue to pressure the state to affect their discretion in how to proceed in the case. It is true that the trial court could have perhaps ordered them to be certified, but the parties and the court all reasonably looked at the plain and unambiguous language here and concluded that the rule did not apply. And because defense counsel stated that they did not want to get certified, because they said they did not want a third certified attorney to be appointed to help them, and because defendant, when he was directly asked, said he had no comment, the trial judge... These attorneys were appointed. Wouldn't you think that the defendant would think that the court would know that a proper attorney should be appointed for him or he wouldn't argue with that? Well, certainly. And certainly because the rule does not have admonishments as part of the process, nothing incorrect was done here because, again, the plain language did not require them to be certified. The rule simply did not apply. And so there was no reason for the trial judge to actually order them to do something that was not required under the rule. And this is actually not an absurd result, despite the defendant's argument to the contrary, because what the drafters did here was to draw a bright line rule. And the natural consequence of drawing a bright line is that there will be some cases that fall on the other side of the line. The simple fact that the rule will not apply to some cases in and of itself is not an absurd result. It's an inevitable consequence of drawing a bright line. And, Justice Burke, as you pointed out in a question to opposing counsel, there is an indication in the findings from the special Supreme Court committee that drafted this rule that they were considering the attorney-client relationship and balancing that against this prophylactic goal of discouraging and constitutionally ineffective assistance of counsel when trying to choose the date on which the rule would be effective. And so choosing a date that was very early in proceedings, the filing of a charging instrument, was indeed a very rational and even wise choice, because the farther that criminal proceedings progress, the more disruptive it is to change attorneys and to rebuild a new attorney-client relationship. And that is true whether it's retained counsel or appointed counsel, as there was in this case. Ms. Mednick, you said a couple of times that perhaps the trial court should have ordered these lawyers to become qualified. Could the court have done that, or was the option to replace them with other lawyers? Well, I wouldn't say that they should have. I think it was an option the trial judge certainly could have ordered them. But the trial judge was actually acting prudently, one could say, because the rule did not require this step. So there really was no basis for the trial judge to put this burden on counsel to become certified. So actually there was nothing improper in what occurred here. Okay, but do you think the trial court had the authority to order them to do something they didn't want to do? Well, I guess it's a little unclear under the rule what the trial judge is supposed to do in situations. Even assuming we had facts where the rule did apply, what does happen in a case where counsel refuses to become certified? The only indication in the committee comments to this rule is to encourage counsel, at the very earliest moment they think that it might be a capital case, to either decline representation or to go get certified immediately. It has nothing about what the trial judge should do. So actually the rule is silent on that issue. I guess I personally can't think of why the trial judge perhaps couldn't do it. But on the other hand, that really is irrelevant in this case because the plain language does not apply here. But from what you said, the rule, the implication is the attorney shall decline. Right. The rule kind of explains to the attorney, and these attorneys refuse to do so. So following up Justice Carminer's question is then perhaps the judge could have or maybe should have dismissed them. Yes, but still the very first and most important fact is that the detergent instrument was filed five years prior to the effective date. So maybe that's true in future cases in which the rule does apply and which defense counsel – But this trial took place, or state took place and sentencing took place five years after that. Well, actually there's some important facts here that should be considered, and that is in August 2000, that is when this court reversed and remanded. So that was still two years before the effective date. Just the fact that the proceedings lasted for six and a half more years during pretrial, in and of itself was mostly due to the fact that the Senate sought two interlocutory appeals. And you should be punished for that, Judy. Well, no, but again, the fact that the rule indicates that it is the early stage of proceedings, the filing of the charging instrument, if this court were to try to extend this rationale to retrials and say perhaps the date of the remand and the reversal is comparable, that that is then the date rather than looking back to the original charging instrument, that would be changing the plain language. But if this court were to choose to do so, this case would still not be applicable to the rule because that happened more than a year prior to the effective date. So again, under the facts, this court would actually have to ignore three components of the plain language of the rule in order to get it to apply to this case. Not only the fact that there's not a provision or an exception for remands and retrials, but also the fact that the charging instrument is chosen as the only key event to determine effectiveness. And third, the fact that this obligation of getting certified is triggered under Rule 416C at the moment that a case is clearly capital. And that happens on one of two events, either when the state files its notice of intent to seek the death penalty or the expiration of 120 days after the arraignment, which is when the notice is actually due to be filed by the state. Here, the 120 days after arraignment expired more than a year before the effective date, after the reversal and the remand. So there would have to be extensive rewriting of what is plain and unambiguous language of multiple aspects of this rule in order to get it to apply to this case. And there's simply no call for such extensive rewriting in light of the fact that the only absurdity the defendant points to is simply the circumstance, the happenstance, that he is the only one that does not have counsel as certified. But again, drawing a Brat Lane rule means that someone will fall on the other side of it. Were these attorneys the same attorneys that represented the defendant at the first trial? The lead counsel did represent him at the first trial. The co-counsel, Mr. Carter, was not involved in the first trial. So another point that's important to consider is even if this court were to find some sort of error, this was not reversible error. Not only was it invited error because of what I've already cited about how defense counsel explicitly refused to become certified and tried to use this issue to pressure the state not to seek the death penalty if the state was really concerned about the issue. But wasn't there an issue, too, with regard to the state's attorney? One state's attorney said she was not going to seek the death penalty, and then later there was a change of state's attorneys? There was a change of state's attorneys. I can change to that issue if you would like. Why doesn't that play into it? Well, under the rule, there is no certification requirement of the state's attorneys or assistant attorneys general. So there is not the same dynamic in terms of that. Maybe I'm misunderstanding your question. No, it's seeking a death penalty. Well, the state's attorney in 2002 did not say absolutely that she was not seeking it. Instead, she just made a record that she had offered him a deal to plead guilty in exchange for a license, but he rejected that offer in 2002. And from there, they proceeded as though they were preparing for a capital case. They were having these discussions about capital litigation trial bar counsel. They were having extensive motion practice, which included motions, challenging the constitutionality of the death penalty. So, again, the attorneys knew there was a capital case from 2002 on. Exactly. That is correct. And so then, as has been touched upon in opposing counsel's argument, it was made of record the qualifications of defense counsel that, to the extent that they could, they clearly showed that they satisfied three of the five requirements under Rule 714 in terms of being licensed in Illinois, in terms of their years of experience, and in terms of their number of trials and murder trials. Now, while it is true that there are two more requirements about substantial familiarity with ethics and procedure under Illinois law, as well as forensic evidence, expert evidence, that while it simply cannot be recited in the record in the same way, given the fact that both of them far exceeded the number of years of experience, it is essentially expected that they would have been certified if they had applied, especially because the process includes the possibility of a waiver, which the special Supreme Court committee acknowledged was put into place because of recognition that it would be hard for attorneys from smaller counties to meet all the qualifications as easily as people from larger counties. And, indeed, this is a case out of a smaller county in Illinois. Now, it is true, and there are many examples that can be found at page 37 of the Appley's brief, of cases where this court has declined to reverse, given a violation of a rule, unless prejudice has been shown. Because, again, this was a prophylactic rule. And because of the fact that the trial court said that counsel was qualified, to the extent that he could make a judgment that these attorneys were qualified, and the fact that the only types of ineffective assistance of counsel claims that are raised here on appeal are simply sub-claims that point out when certain issues were not properly preserved in the trial court, and one sub-issue about turning over an expert opinion during discovery. Now, there is nothing capital specific about these types of potential errors. And, furthermore, defendants have not actually succeeded in establishing these claims, as is discussed in more detail in the Appley's brief. So, if there are no further questions on this issue, I will then turn to the fourth issue, the other issue that defense counsel focused on. And that issue concerns the defense expert, Dr. Conroe. Now, defendants' argument, which apparently is one that is raised for the first time on appeal, is that it is simply not a matter of opinion whether a person has an extreme mental or emotional disturbance. It is important to note that we have two entirely separate references or sources at issue here. Defendant tries to assert that because Dr. Conroe diagnosed defendant with certain mental disorders, and the fact that the diagnostic and statistical manual used by psychiatrists to make these diagnoses sometimes use the word disturbance, that it is simply some sort of matter of semantics or labels that he ultimately gave this question about whether he had a mental disturbance. But that is confusing the resources that apply, because, after all, the reason this was even an issue was because defendant was trying to make an argument under the statutory mitigating factor of Section 9.1.C.2. Now, the way that that term is used in the statute, as defined in Phillips and other cases, is an entirely separate issue from the way that psychiatrists might choose to use that term in their own references. To put it a different way, the fact that defendant has quoted here even today, in his brief, extensive portions of Dr. Conroe's report about his observations of defendant's emotional state, his feelings, his abandonment, the characteristics of his mental disorders, those are all pieces of evidence that might go to the ultimate decision of whether the statutory mitigating factor applies or not, in the same way that perhaps a psychiatrist, such as Dr. Conroe, may point out various characteristics of a person and use those characteristics to decide to diagnose that person with a certain disorder. But the diagnosis, that ultimate decision of whether that diagnosis is appropriate or that ultimate decision of whether the statute actually applies, is a matter of opinion. And, indeed, there are several cases from this court which show that the specific Section 9.1.C.2 is a matter of expert opinion. And so, indeed, the trial judge was correct in concluding that this was a matter of opinion that did need to be disclosed during discovery. And defendant here conceded that he never used that term in his report or his deposition. He acknowledges that it wasn't disclosed. So we can't simply dodge around that fact by simply saying it's a matter of labeling. Also, all those symptoms, the doctor did use in his report, didn't he? Yes, he did. And he was allowed to testify to that, which actually shows how narrow the thing was. Equally, though, with those symptoms, though, do have labels, right? He did not use the word disturbance. But it does mean the same thing without a label. Well, you know, it's still for him to make that ultimate conclusion. I mean, yes, it's certainly relevant to that decision. But that ultimate decision still should be expressed and still should have been disclosed during discovery. And, again, I would turn to that analogy of a diagnosis. Say his report listed all the diagnostic criteria of one of his mental disorders, but he left out the sentence that said, I diagnose him with Asperger's disorder. If he had never said that sentence, it would be inappropriate for him to give that opinion later on, even though you could point to his report and see the relevant evidence that would go to that decision. Isn't that an elevating form over substance? Well, I mean, the fact remains that because all of this underlying evidence was allowed, this testimony was allowed, the jury was equally able to make that ultimate decision itself. It's not simply a matter of form over substance. But the jury was told to disregard that. Disregard that one question and answer. But they were instructed during jury instructions that they should consider the specific statutory mitigating factor of sexual assault. So they were told, yes, you should consider, based on the evidence you received, whether this mitigating factor exists. And so that actually supports the argument that they could make that decision for themselves. It is mere speculation to think they would have interpreted it the way they did in the search. I have two questions. One is, how was the state unfairly surprised by this opinion testimony? And two is, your opposing counsel has, in response to a question I asked, said, well, the defense counsel didn't argue these factors as applying to that statutory mitigating factor. What's your response on that? Well, my response to the first answer would be that they certainly knew from the report that they were going to put forth this evidence about his emotional state, but they were not informed specifically about the statutory factor, that that's what it would be used for to make that ultimate opinion. And as for the argument that was made during closing argument, defense counsel is correct that during closing defense counsel did not make that specific argument, but that could have been a strategic choice because actually there was much evidence to the contrary to show that, no, he was not acting under an extreme mental or emotional disturbance because he actually showed extensive steps of planning and concealment and rational choice about trying to conceal what he had done, such as making sure the adults were lured outside the sloop household, making sure he snuck in so no one would see his approach, cutting the phone lines before he entered, making sure his gun was accessible. These are not the steps of someone who simply had an emotional break and responded irrationally, as is envisioned under the statutory factor. Instead, there was actually extensive evidence that he acted in a very cold and calculating manner. After all, that is one of the death eligibility factors that the jury found during the eligibility stage. So perhaps instead defense counsel made the strategic choice, rather than expressly emphasizing that factor, to simply play up his mental illness as a potential mitigator in terms of explaining why, rather than painting what happened as being an emotional break. And if there are no further questions on this issue, I'd actually like to touch very briefly on a few other issues, and I would welcome questions at any time, obviously, about any of the issues. Since we touched briefly on the successor and predecessor state's attorney, I'll turn to that issue briefly. It is true that in November 2002, state's attorney Andrews offered a guilty plea deal in exchange for a life sentence. But it is clear on the record at that time that that deal was rejected. Defense counsel said, at this time, I think we're going to trial. And the fact that from there, four and a half years into the future, the parties proceeded as if they were preparing for a capital trial, shows that it was understood by everybody that that deal was rejected and off the table. There was, again, those motions filed about the death penalty. There were these questions raised about the CLTB membership, which shows everyone knew that the offer had been rescinded and had been rejected. It was not until April 2007 that the guilty plea deal that actually was made was entered, and that was a different deal. It was pleading guilty in exchange for the dismissal of some other counts, and defendant was clearly admonished, and he individually confirmed that he understood that the capital sentence was a possible sentence that he could receive. And so it is clear that this is not a case where there was unfairness, as defendant cites, because, after all, the Senate relies upon two cases that are distinguishable, the concurrence from Walker and the Brownell case. Notably, in the Walker case, there actually was a plea deal that was made, that there was a guilty plea entered in exchange for a 60-year sentence, and that specific fact, that there had been an agreement between the parties, was cited by the concurrence as why there was notions of fairness and due process that prevented the state, once the guilty plea was thought to be vacated by defendant, from seeking the death penalty three months later. The important distinguishing factor about the Brownell case was the very short time frame. The offer was made at 10 p.m. that they would not seek the death penalty if the defendant provided a written confession. While at 10 p.m. he said, I'm not going to accept this offer, defense counsel did tell the prosecutor at 1 a.m. that I need more time, that we need more time to consider this offer. So the fact that at 2 a.m., defendant, outside the presence of his attorney, did provide the written confession, this court said that it would not be fair for a defendant who in this course of four hours had no indication that this offer would have been off the table, the offer would have expired, that that was why the state could not seek the death penalty afterwards. That is not what we have here, because we have an offer that was rejected, or even if your honors agree with defendant that it was merely deferred, we have four and a half years of the parties proceeding, as though it was a capital case that was going to trial, that was an important intervening circumstance that justified the successor state's attorney using his discretion to seek the death penalty. And so if there are no, oh, and actually one last point about that, defendant acknowledges in reply brief that this was a forfeited issue, and if he is correct that he can raise that for the first time in his reply brief, which seems to be true under the Williams case, he still has his burden of proving the elements of plain error, and he has not done so sufficiently. He does not even attempt to argue as to this claim that the evidence was closely balanced, and his only attempt to establish pronged two-plane error is to say that this issue is about whether there was a death penalty or a life sentence, and so it was a serious error. Well, that is not pronged two-plane error, because that rationale would apply to any claim in any capital case, and this court has not applied pronged two-plane error in capital cases so broadly. So this claim could be rejected on plain error alone, or the failure to establish plain error. I have a few more minutes, so I think I'll turn briefly to the sixth issue, which counsel also briefly touched upon. There are actually two types of statements that the defendant points to during the prosecutor's closing argument. There was one quote about this defense expert testimony about his potential future positive jail behavior, and also there was a set of statements about the potential applicability of an aggravating factor about silencing a witness. But turning to the part that the defendant focused on about the jail behavior, this court should take careful note to compare the quote the defendant provides in his brief against the quote provided in the appellee's brief, because he provides a more limited quote that does not provide the context of what counsel said before and after the part that he quotes. Importantly, the prosecutor began his comments by saying that, yes, you should consider mitigating evidence. When he got to the part of discussing Dr. Cunningham, the defense expert, he says it is not relevant to doing justice in this case for you to consider this evidence of positive jail behavior. But under Davis, isn't it relevant? Well, yes, and actually he concluded by saying, quote, we suggest that Dr. Cunningham's evidence is not entitled to much weight here. So considering the context of all his statements, he was not saying that the evidence was legally inadmissible. He said it was not relevant. Well, he said it was not relevant to doing justice in this case. So he was making the point that when you weigh the seriousness of the crimes, the brutality of the injuries inflicted against, yes, that he behaves well in jail, that it's not really relevant to doing justice in the case. In other words, it should not be given much weight. And that is an entirely proper argument to be made. Even under Davis, you say it's a good argument, even though Davis says it is relevant? Certainly. Well, Davis said it's a good behavior in jail and a positive adjustment. Davis is notably distinguishable because there it was the judge who was the sentencer, and there he said, I refuse to consider as a matter of law this evidence as the sentencer. So he was making the determination that he would absolutely not, as a legal matter, consider this evidence at all. That is different than what we have here because what we have here is the prosecutor saying, when you're weighing all the evidence, this is not relevant to doing justice. And the jury was instructed that closing arguments are not evidence, that it is for the trial judge to decide the admissibility of evidence. And after all, Dr. Cunningham was allowed to testify in full, so this evidence was offered to the jury for their consideration. It was not barred, as it was in Davis, from being considered at all. And this is also distinguishable from defendant's other case of Skipper because there the trial judge made a ruling that I am barring this testimony of positive jail behavior to be considered by the sentencer. So in both of those cases, it was a determination of legal inadmissibility by the judge whose purpose it was to make such a legal ruling. That is not what we have here. Here we just have a prosecutor talking about the aggravating and mitigating evidence and saying this is not entitled to much weight. And so that is why it's distinguishable. As a final point, since I see my time is becoming limited, at the very least, even if this is considered error, it should not be considered pronged to plain error because, after all, both components of the sixth claim were not preserved. They were both forfeited. And so defendant has the burden of proving plain error here. This does not rise to the level of pronged to plain error because, again, the standard is whether there is a substantial risk that the jury would misunderstand their duty. And given the entirety of the jury instructions and considering the comments in full, defendant has not met that high standard. Also, the evidence of aggravation and mitigation was not closely balanced. Certainly at pages 76 through 83, this court can review in detail the discussion of the aggravating and mitigating evidence, but to quickly summarize, this court should note that there were three death eligibility factors found. The defendant pled guilty to attempted murder, which shows that he admitted that he intended to kill five people that night from the ages of 2 through 17, all of these victims who were vulnerable, defenseless, and friends of defendants. He killed 12-year-old Lana Sluke and shot two toddlers for doing nothing more than screaming at the sound of gunfire. He brutally raped his friend Laura and taped her head so she could not breathe before shooting her in the head. And I could go on, but there certainly were extensive details here about brutal injuries inflicted, about the concealing and calculated steps he took to make sure he could approach the Sluke household undetected, to make sure there was no adult supervision, that showed planning and cold and calculated attempts to commit these crimes, which had drastic damaging results to even three surviving victims, whose injuries were all termed to be life-threatening. And so this court should find that the aggravating and mitigating evidence was not closely balanced. Are there any other questions about this or any other issue? If not, I would simply ask that this court affirm the convictions and sentences and to set a date certain for the execution. Thank you. Let me start out by acknowledging that these were horrific crimes. But this court knows well that in considering a death penalty case, you don't only consider the crime but the history and character of the defendant. This was an emotionally disturbed, mentally damaged 18-year-old who simply could not control his emotions after he learned that his girlfriend had broken up with him and his friends were telling him maybe she was just using him. This was an unimaginable tragedy. Dan Ramsey is not among the worst of the worst offenders, although his crimes were terrible. I urge this court, as the prosecutor does, to read the mitigation and aggravation in this case. And I think you'll see that this is as much a tragedy as any crime that's come before this court. On the question of the prosecutor's improper argument, Skipper and Davis don't control here because the issue isn't the same, but those are the cases that held that good behavior in prison is relevant. It set the stage for this issue. And it's interesting that my opponent said that we didn't give a full quote in our brief. Three times, she said up here, the prosecutor said that Dr. Cunningham's testimony wasn't relevant to doing justice in this case. Well, that isn't all he said. The very next sentence is the one we complain about. He said, is that relevant to doing justice in this case? How is that relevant to what the appropriate sentence of the defendant should be, or to his actions in this case, or to any issue that you have to decide in this case? That is in direct contradiction to Skipper and Davis, to argue to the jurors that a defendant's 11-year history of good behavior in prison is not relevant to their sentencing decision. Now, it's true the prosecutor also said to the jurors, don't give it little weight, but there's a right way and a wrong way to argue that mitigation should be given little weight. And this prosecutor knew the difference. He argued that Dr. Gurr's testimony about adolescent brain development shouldn't be given much weight. He said it should not be given much weight by you when you consider defendant's mitigation. He didn't say Dr. Gurr's testimony was irrelevant.  We suggest this mitigating evidence is not worth much to your decision. That's fine. He didn't argue that was irrelevant. He argued that the Skipper-Davis evidence was irrelevant. And I don't think it matters that he also made a proper comment. That doesn't change the fact that he made an improper comment. If he had limited his comment about Dr. Cunningham the same way he did to the other things, we wouldn't be complaining about it. On the capital litigation trial bar issue, this can't be invited error. If the rule doesn't apply, then there was no error. If the rule does apply, Dan Ramsey should not be bound by the actions of lawyers who shouldn't have represented him in the first place. So we don't think there's any invited error here. Also, we don't really disagree that much about a bright line. We agree that the court made a bright line in terms of trials. Our specific argument here is the intent of this court was not to exclude retrials or resentencings that take place after the effective date. Because if you think about it, retrials really are not very distinguishable from the original filing of a charge in a case. The defendant's right to a jury is renewed at a retrial, right to counsel is renewed, even if they went pro se, right to remain silent. A retrial or a remand is almost like the beginning of the case all over. Many times prosecutors reindict. Actually here, it's just serendipity that the prosecutor didn't file a new indictment, which I know some prosecutors do. In this case, didn't they dismiss some of the charges before? The only thing that was dismissed here by the prosecutor before the plea were two superfluous murder charges. Dan Ramsey pled guilty to intentional murder and felony murder, and the prosecutor dismissed two charges of knowing and intentional murder. But they were meaningless, Justice Burke. The prosecutor also argued that even if it applies to retrials, it doesn't apply to this case because this retrial, the appearance after remand was still before the effective date. But if you think about it, the logical conclusion of that argument is, even though Dan Ramsey wasn't entitled to certified lawyers at his first retrial, if he happens to win this case, the arraignment on remand will take place after the effective date, and he will be entitled to certified lawyers. I think the argument that a defendant was entitled to certified lawyers at his second retrial and not his first retrial is probably more absurd than if you don't apply it to retrials in the first place. There's no logical way out of the problem that this court, to reject this argument, will have to say if any of those eight defendants on death row now who got certified lawyers but won't get them next time if they appear back in Illinois courts after having obtained relief. There's no way around that. It's true, Justice Conroy, that one of the lawyers did represent him at his first trial, and he was familiar with the case. But I think if I were a defendant facing the death penalty, I'd prefer a lawyer who was certified by this court to be qualified to represent me rather than simply familiar with my case. These lawyers didn't control the outcome here. I don't know that the court could have required them to become certified, but he certainly could have told them get certified or get off the case. On the extreme mental or emotional disturbance issue, how do you address opposing counsel's argument that even without certification, most of the certification requirements were met by the attorneys here? And what I'm thinking about is what if there was an attorney that was certified who had let the certification lapse? Would you be arguing that there's a per se rule that even though that attorney was certified a day before the retrial and not certified the day of the retrial, that necessarily a new trial would be warranted? I think if a lawyer had been certified by this court and it lapsed by one day, I think that would be more analogous to the failure to pay dues issue because that lawyer would have been found by this court to be qualified. And I don't think just a bureaucratic snafu would make him or her unqualified. But that's not what we have here. These lawyers did meet probably the minimum requirement of experience. The lead counsel had two prior murder cases. The second chair had one prior murder case, and they required five or eight felonies. But that I don't think close meets the requirements here. There's no showing on this record that they had the required experience in so many areas that are vital to capital litigation, such as forensics. And it even mentions in the rule a familiarity with mental health experts. And we know what happened in this case with Dr. Conroe. So three out of five is a number. It's just a statistic. The fact is they got no required training, and there's no showing they were familiar. So I would argue they missed two out of three rather than they hit three out of five. I hope that answers your question. It does. I'm just thinking, you know, the whole purpose of the rule is for the court to have been satisfied that obviously the attorneys trying the case are competent. Yes. Could this court make a de novo resolution as to whether or not these two attorneys were competent to try the case? I think there's a difference. And then go into a traditional ineffective assistance of counsel type of analysis. I think there's a difference between being competent to do a case and being certified by this court as a member of the capital litigation trial bar. If the rule didn't apply, then all you'd have to decide is whether they were competent to do this case and whether they did a competent job. But if the rule did apply, clearly they didn't meet the requirements. They had none of the required training. And they weren't counsel to which this defendant was entitled. And again, Justice Thomas, if tomorrow a judge would appoint non-certified lawyers to a capital case and those lawyers did a fine job, I don't think this court would take a very good look at that, and I don't think the proper thing to do would be to jump right to a strict and ineffective analysis. I think what this court would do again, as it has done in so many cases, is say, our rules are not suggestions. Our rules apply. And they must be enforced. On the extreme mental or emotional disturbance issue, if I had an expert witness in a capital case who testified at deposition that there was an event somewhat contemporaneous with the murder that inflamed the defendant's emotional stance to such a fragile point as to leave him with little to no emotional control, and that's all the witness testified to, and he didn't use the word disturbance, I think that I could argue that the defendant was under an extreme emotional disturbance. That's the definition of it right out of this court's opinion in Phillips. Now, it's true that in Ramirez, this court held that an expert witness can testify to the ultimate question and can use the language of the statutory aggravating factor, but that doesn't mean the witness has to. And clearly, if you compare the definition of extreme mental or emotional disturbance in Phillips with all of the things Dr. Conroe put in his report and testified to at his deposition, there's no question that any experienced capital litigator would have understood that the purpose of his testimony was to establish that statutory mitigating factor. I thank the court this time. Thank you.